IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE DISTRICT OF SOUTH CAROLINA

GREENVILLE DIVISION

Tracy E. Cook,                          )
                                        )     Civil Action No. 6:07-0631-HMH-WMC
                    Plaintiff,          )
                                        )     **REPORT OF MAGISTRATE JUDGE**
            vs.                         )
                                        )
Michael J. Astrue,                      )
Commissioner of Social Security,        )
                                        )
                    Defendant.          )
_____)

       This case is before the court for a report and recommendation pursuant to Local Rule 73.02(B)(2)(a), D.S.C., concerning the disposition of Social Security cases in this District, and Title 28, United States Code, Section 636(b)(1)(B).[1]

       The plaintiff brought this action pursuant to Section 205(g) of the Social Security Act, as amended (42 U.S.C. 405(g)), to obtain judicial review of a final decision of the Commissioner of Social Security denying his claim for disability insurance benefits under Title II of the Social Security Act.

## ADMINISTRATIVE PROCEEDINGS

       The plaintiff filed an application for disability insurance benefits on November 12, 2002, alleging that he became unable to work on November 1, 2001. The application was denied initially and on reconsideration by the Social Security Administration. On July 1, 2003, the plaintiff requested a hearing. The administrative law judge, before whom the plaintiff, his attorney and a vocational expert appeared on June 9, 2004,

---

[1]A report and recommendation is being filed in this case, in which one or both parties declined to consent to disposition by the magistrate judge.

considered the case *de novo*, and on May 14, 2004, found that the plaintiff was not under a disability as defined in the Social Security Act, as amended. The administrative law judge's finding became the final decision of the Commissioner of Social Security when it was approved by the Appeals Council on January 10, 2007. The plaintiff then filed this action for judicial review.

In making his determination that the plaintiff is not entitled to benefits, the Commissioner has adopted the following findings of the administrative law judge:

(1)    The claimant met the non-disability requirements for a period of disability and Disability Insurance Benefits set forth in Section 216(I) of the Social Security Act and is insured for benefits through the date of this decision.

(2)    The claimant has not engaged in substantial gainful activity since his alleged onset of disability.

(3)    The claimant's small left paracentral disc herniation is a "severe" impairment, based upon the requirements in the Regulations (20 CFR § 404.1520(c)).

(4)    This medically determinable impairment does not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, of Regulation No. 4.

(5)    The claimant's allegations regarding his limitations are not totally credible for the reasons set forth in the body of the decision.

(6)    The claimant has the residual functional capacity to perform light work activity.

(7)    The claimant is capable of performing his past relevant work as a car wash attendant (20 CFR § 404.1565).

(8)    The claimant is a "younger individual between the ages of 18 and 44" (20 CFR § 404.1563).

(9)    The claimant has a "high school (or high school equivalent) education" (20 CFR § 404.1564).

(10)    The claimant has no transferable skills from any past relevant work and/or transferability of skills is not an issue in this case (20 CFR § 404.1568).

2

(11)    Based on an exertional capacity for light work, and the claimant's age, education, and work experience, Medical-Vocational Rule 202.20, Appendix 2, Subpart P, of Regulations No. 4 would direct a conclusion of "not disabled."

(12)    The claimant's capacity for light work is substantially intact and has not been compromised by any non-exertional limitations. Accordingly, using the above-cited rule(s) as a framework for decision-making, the claimant is not disabled.

(13)    The claimant was not under a "disability," as defined in the Social Security Act, at any time through the date of this decision (20 CFR § 404.1520(g)).

The only issues before the court are whether proper legal standards were applied and whether the final decision of the Commissioner is supported by substantial evidence.

## APPLICABLE LAW

The Social Security Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability."   42 U.S.C. §423(a).   "Disability" is defined in 42 U.S.C. §423(d)(1)(A) as:

the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

To facilitate a uniform and efficient processing of disability claims, the Social Security Act has by regulation reduced the statutory definition of "disability" to a series of five sequential questions.  An examiner must consider whether the claimant (1) is engaged in substantial gainful activity, (2) has a severe impairment, (3) has an impairment which equals an illness contained in the Social Security Administration's Official Listings of Impairments found at 20 C.F.R. Part 4, Subpart P, App. 1, (4) has an impairment which

3

prevents past relevant work, and (5) has an impairment which prevents him from doing substantial gainful employment. 20 C.F.R. §404.1520. If an individual is found not disabled at any step, further inquiry is unnecessary. 20 C.F.R. §404.1503(a). *Hall v. Harris*, 658 F.2d 260 (4th Cir. 1981).

A plaintiff is not disabled within the meaning of the Act if he can return to past relevant work as it is customarily performed in the economy or as the claimant actually performed the work. SSR 82–62. The plaintiff bears the burden of establishing his inability to work within the meaning of the Act. 42 U.S.C. §423(d)(5). He must make a prima facie showing of disability by showing he is unable to return to his past relevant work. *Grant v. Schweiker*, 699 F.2d 189, 191 (4th Cir. 1983).

Once an individual has established an inability to return to his past relevant work, the burden is on the Commissioner to come forward with evidence that the plaintiff can perform alternative work and that such work exists in the regional economy. The Commissioner may carry the burden of demonstrating the existence of jobs available in the national economy which the plaintiff can perform despite the existence of impairments which prevent the return to past relevant work by obtaining testimony from a vocational expert. *Id.*

The scope of judicial review by the federal courts in disability cases is narrowly tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the correct law was applied. *Richardson v. Perales*, 402 U.S. 389 (1971); *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). Consequently, the Act precludes a *de novo* review of the evidence and requires the court to uphold the Commissioner's decision as long as it is supported by substantial evidence. *See Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (*citing Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). The phrase "supported by substantial evidence" is defined as :

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

Thus, it is the duty of this court to give careful scrutiny to the whole record to assure that there is a sound foundation for the Commissioner's findings, and that her conclusion is rational. *Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed. *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

## EVIDENCE PRESENTED

The plaintiff was born in 1969 and was 31 years old on November 1, 2001, the date of his alleged onset of disability due to limitations caused by a herniated disc (Tr. 52). He has a high school education and past work experience as a car wash attendant, warehouse worker, processor at a chicken plant, and machine operator (Tr. 66).

The record reveals that in July 2002, the plaintiff reported to the emergency room complaining of pain in his left thigh. Physical examination revealed musculoskeletal myalgias. An x-ray of the plaintiff's left femur and left knee was negative and an x-ray of the lumbar spine was normal (Tr. 117-19). A September 16, 2002, CT scan of the plaintiff's lumbar spine revealed a small left paracentral disc herniation at the L4-5 level (Tr. 110).

On November 26, 2002, Dr. Naren Kansal examined the plaintiff. He noted that the plaintiff had been doing well until April 2002, when he began complaining of back pain and left thigh pain. The plaintiff reported that physical therapy provided no benefit and that he had swelling in both feet and the right hand. On examination, the plaintiff walked with some discomfort. Examination of the lumbar spine did not show any definite areas of tenderness. The plaintiff had tenderness in the left SI area. Reflexes were normal and

there was no focal motor deficit. Straight leg raising tests were negative. Dr. Kansal opined that the herniated disc reflected in the September CT scan would not explain the plaintiff's symptoms. His assessment was left SI joint dysfunction and bilateral lower extremity and right upper extremity dysfunction, etiology undetermined. He opined that the plaintiff's condition was not suggestive of myelopathy (Tr. 124-25).

On February 3, 2003, Dr. B. Eun Lee completed a form sent by the Commissioner. Dr. Lee indicated that he had treated the plaintiff from July 2002 to February 2003 for left thigh and knee pain, hematuria, and constant back pain. He wrote that the plaintiff's symptom was swelling in his feet, knees and right hand. Dr. Lee noted no clinical findings. He noted that the plaintiff's September 2002 CT scan showed a small disc herniation. He did not indicate there was any limitation in the plaintiff's range of motion, or in his ability to stand, walk, or sit, but that there was some (undescribed) limitation in the ability to push and pull (Tr. 133-36).

On February 23, 2003, a State agency physician reviewed the plaintiff's medical records and assessed his residual functional capacity. The physician indicated that the plaintiff could lift, carry, push and pull 10 pounds frequently and 20 pounds occasionally; sit about six hours in an eight-hour workday; stand or walk about six hours in an eight-hour workday; occasionally climb, balance, and stoop; never kneel, crouch, and crawl; and had no manipulative, visual, communicative, or environmental limitations (Tr. 158-60).

The plaintiff reported to Dr. Deli Wang in March and April 2003 for treatment of pain. The plaintiff described back pain, and an MRI revealed a moderate broad base herniated disc at L4-5. The plaintiff also complained of anxiety. Examination revealed no abnormalities. Dr. Wang's assessment was lumbago, muscle spasm, malaise and fatigue, and anxiety. He prescribed conservative measures (Tr. 145-46).

On May 5, 2003, the plaintiff reported to Dr. Thomas Ewart of the Moore Clinic for evaluation of back pain and bilateral knee and foot pain. Examination revealed the

6

plaintiff could walk on his heels and toes, even though he said he could not. The plaintiff had flat feet (pes planus). He was able to squat and perform all activities requested. There was no evidence of muscle weakness or atrophy, sensory deficit or limited range of motion, except in the lumbar spine. Dr. Ewart's assessment was back pain radiculitis without radiculopathy and flat feet resulting in foot, ankle and knee pain. He recommended arch supports and other conservative measures (Tr. 140-41).

Four days later, on May 9, 2003, Dr. Wang wrote a report in which he asserted that the plaintiff's limitations included no prolonged sitting or standing and no lifting more than 15 pounds. He noted that physical findings included tenderness at the L4-5 and laboratory findings included an MRI of the L4-5 disc space revealing broad based herniation (Tr. 143-44).

On May 10, 2003, a State agency physician reviewed the plaintiff's medical records and assessed his residual functional capacity. The physician indicated that the plaintiff could lift, carry, push and pull 25 pounds frequently and 50 pounds occasionally; sit about six hours in an eight-hour workday; stand or walk about six hours in an eight-hour workday; frequently climb, balance, stoop, kneel, crouch, and crawl; never climb ramps and stairs; and had no manipulative, visual, communicative or environmental limitations. He noted that his evaluation was more consistent with the medical evidence than Dr. Wang's assessment (Tr. 150-56).

On November 10, 2003, Dr. Wang wrote a letter to the plaintiff's representatives in which he noted that the plaintiff had complained of neck pain since April 2002, joint pain in his elbows, knees and both wrists, and of a burning sensation in his left thigh. Dr. Wang noted that physical examination revealed tenderness in the neck, spine, left elbow and both knees. He commented that the plaintiff had "a lot of pain in his lower back and both knees which limited his ability to function. He opined that the plaintiff had "work-related musculoskeletal disorders (WRMD)." He thought the plaintiff would be unable

7

to walk or stand long enough to engage in a meaningful job; could not perform work requiring frequent standing, bending, lifting, and walking; and should not have lifted more than 15 pounds (Tr. 163-69).

Dr. Wang also completed a check-box assessment of the plaintiff's residual functional capacity, in which he indicated the plaintiff could lift and carry 10 pounds frequently and 20 pounds occasionally; needed a hand-held device to stand or walk; needed a sit stand option; was limited in his ability to push and pull; could never climb, crouch or crawl; could occasionally balance, stoop and kneel; had no manipulative, visual or communicative limitations; and needed to avoid concentrated exposure to extreme cold and heat, wetness, noise, humidity, vibration, fumes and hazards (Tr. 170-73).

On July 22, 2004, the plaintiff reported to Dr. Ugo Okereke for treatment of his back pain.  The plaintiff complained of back pain radiating down to his thighs which was "severe" and intolerable without medication.   He also complained of numbness, parasthesis, burning feet pains, and hand numbness.  Examination was normal, except for diminished range of motion and pain in the lumbar spine.  A motor nerve conduction study showed global neuropathy (Tr. 192-96).

At the hearing, the plaintiff testified that he was 35 years old and had a GED (Tr. 256); that he was married and lived with his wife and six children (Tr. 257); that he had a driver's license and drove a car (Tr. 255); and that he had worked at a car wash, at a chicken processing plant, at a liquor warehouse, and as a machine operator (Tr. 259-67). He testified that he had not worked since March 2003 (Tr. 260).  The plaintiff testified that his worst problem was his back (Tr. 288).  He said that he had a constant "sharp, dull pain" (Tr. 270).  He claimed the pain went up to his neck, causing headaches, and down to his knees and ankles (Tr. 270-71).  He said he had foot pain which he described as "real sore" (Tr. 271).  He also claimed he had pain in his right elbow and shoulders (Tr. 271).  The plaintiff said that since 2003 he had been walking with a cane which had been prescribed

8

by Dr. Wang (Tr. 272-73).  He said that his hands swelled every day and affected his ability to grip things (Tr. 273).  He said he was taking medication, which he claimed made him drowsy (Tr. 274).  He also said that he became dizzy (Tr. 275).

The plaintiff testified that he could walk to his mailbox; could stand about 10 to 15 minutes; and could sit for 25 to 30 minutes (Tr. 278).  He thought he could bend and pick something up one time a day and reach out his arms in front of himself two or three times an hour (Tr. 278).  He said he could not open a two-liter bottle and could not screw a nut and bolt together (Tr. 279).  He claimed that his wife cooked, cleaned, did the laundry, washed dishes and bathed the children (Tr. 279-81).  He said he went shopping with his wife and pushed the cart (Tr. 280).  He said that he took care of three of his children during the day, which included feeding them and making sure they did not hurt themselves (Tr. 280).  He said he cooked oatmeal and made sandwiches (Tr. 281).  He said that he drove his wife two blocks to work and could drive up to five miles at one time (Tr. 282, 284).

Mary Cornelius, a vocational expert, also testified at the hearing.  Ms. Cornelius testified that the plaintiff's past work was as a car wash attendant (light, unskilled), production weigher (medium, semiskilled), machine operator (medium, unskilled), and loader (heavy semiskilled) (Tr. 290).  She said the jobs of production weigher, machine operator and loader required gross dexterity (Tr. 290).  Ms. Cornelius testified that if the plaintiff's testimony was credible he would not be able to work (Tr. 290-291).

The ALJ asked Ms. Cornelius to consider a 35-year-old person who had a GED educational level and the same past work experience as the plaintiff.  The person could lift 10 pounds occasionally and three to five pounds frequently; could occasionally stand and walk; and could perform fine manipulations.  Ms. Cornelius said such a person could perform the jobs of handler, lens inserter, and hand bander.  She said all of the jobs were sedentary, unskilled and required little stooping or bending.  The use of a hand- held

9

cane would not affect the person's ability to perform these jobs. Additionally, the jobs would allow the person to sit or stand at will (Tr. 291-95).

The ALJ then changed the hypothetical so that the person could perform light work, that is, lifting no more than 20 pounds occasionally and 10 pounds frequently, and work that did not require fine dexterity. Ms. Cornelius testified that the person could perform the light, unskilled jobs of customer service clerk, bagger, shirt folder, and paper cone grader (Tr. 293-94). The ALJ found that the plaintiff retained the residual functional capacity ("RFC") to perform a significant range of light work. She further found that the plaintiff could perform his past work as a car wash attendant(Tr. 20). Alternatively, the ALJ found at the fifth step that the plaintiff could perform work that existed in significant numbers in the national economy, including the positions of customer service representative, bagger, shirt folder, and paper cone grader (Tr. 20).

The plaintiff requested that the Appeals Council review the ALJ's decision (Tr. 10). In support of his request for review, the plaintiff submitted additional evidence, including medical records from Dr. Okereke, dated before and after the ALJ's decision (Tr. 197-233), and some medical source statements, all dated after the ALJ's decision (Tr. 234-22, 232-33).

The plaintiff sought treatment from Dr. Okereke on four occasions between August 2004 and January 2005 (Tr. 213-22). The records indicated that the plaintiff continued to complain of pain in his back and legs, but that there were no findings on examination to explain the existence of the pain (Tr. 213-22). The plaintiff continued to have some tenderness in the back on palpation, limited lumbar spine range of motion, and an antalgic gait (Tr. 216). He also noted that the plaintiff was walking with a cane (Tr. 216). The plaintiff told Dr. Okereke that his pain was worsening (Tr. 216).

The plaintiff continued to see Dr. Okereke after the ALJ's decision, from July 2005 until September 2006 (Tr. 199-212). Records indicate that the plaintiff continued to

complain of back, neck, and leg pain, and examinations generally revealed no change in his condition (Tr. 199-212). However, in April 2006, a year after the ALJ's decision, examination revealed an absence of ankle reflexes and bilateral numbness in the feet and absent vibration bilaterally (Tr. 207). In September 2006, Dr. Okereke noted that testing was consistent with underlying peripheral neuropathy (Tr. 210).

The plaintiff developed a renal cyst, which was diagnosed in October 2006 (Tr. 197). On May 13, 2005, three weeks after the ALJ's decision, a person claiming to be a physician completed a Medical Source Statement of Ability to Do Work-Related Activities (Physical) (Tr. 234-37). On the form the physician stated that the plaintiff had more limitations than found by the ALJ. For instance, the physician stated that the plaintiff could not lift; could stand less than two hours in an eight hour workday and needed a hand-held device for ambulation; could sit less than six hours in an eight-hour workday; and could never climb, balance, kneel, crouch, crawl or stoop (Tr. 234-35). On July 15, 2005, another physician completed a Medical Source Statement of Ability to Do Work- Related Activities (Physical) (Tr. 238-41). This physician, as did the other, indicated that the plaintiff could not lift; could stand less than two hours in an eight-hour workday and needed a hand-held device for ambulation; and could sit less than six hours in an eight-hour workday (Tr. 238-39). There is another document titled "Physician's Statement" completed by Dr. Okereke on August 22[2] (Tr. 242). Dr. Okereke wrote that the plaintiff was "permanently disabled due to his medical condition" and lists the diagnosis as back pain, lumbosacral radiculitis, and rheumatoid arthritis (Tr. 242). The Appeals Council considered the new evidence, but found that it did not provide a basis for changing the ALJ's decision (Tr. 6).

[2]The year is illegible.

11

## ANALYSIS

The plaintiff argues that the ALJ erred by (1) failing to give him a proper hearing due to the ALJ's bias and predetermined outcome of the case; (2) failing to properly consider the opinions of his treating physicians; and (3) finding that he was able to perform light exertional work without any additional limitations.

### *Bias*

The plaintiff first claims that he did not receive a fair, impartial hearing due to the bias and predetermined outcome of the case by the ALJ. He complains specifically about three comments made by the ALJ during the hearing. First, the ALJ asked the plaintiff "do you live in your home or do you rent or do you live in a project" (Tr. 257). The plaintiff argues:

> There are no "projects" in this city. There are homes a person without income can apply to live in through the Housing Authority and there are homes where Section 8 pays all or part of the rent but these are individual houses. There are no "projects" such as large apartment complexes which are government funded such as are seen in Chicago or New York City.

(Pl. brief 21). The plaintiff contends that the ALJ's implication was that "a younger black man who is not employed must be living in government project housing" (pl. brief 21). The defendant argues: "One may differ in how one refers to public housing from place to place, but the Commissioner would respectfully request that the Court take judicial notice of the fact that public housing is frequently referred to as the 'projects' both in the deep South as well as in Northern cities" (def. brief 19). This court agrees with the defendant. While the ALJ's question may have been unartfully stated, this court does not see that it is indicative of bias.

12

Second, the ALJ made the statement that the plaintiff "looks like he could play football for the Giants" (Tr. 272). The plaintiff claims the "statement was inflammatory and said only for the purpose of making it appear that Plaintiff was a strong, healthy individual" (pl. brief 21). The plaintiff is approximately 5'9" tall and weighs between 215 and 230 pounds (pl. brief 22). As argued by the defendant, the ALJ's statement appears to be merely a comment on the plaintiff's size.

Lastly, the ALJ asked the plaintiff how many children he had and their ages. The plaintiff answered that he had six children in the home ages one through eight (Tr. 257). The plaintiff claims the "look on [the ALJ's] face made it crystal clear what she was thinking - that an unemployed black man shouldn't have so many children." There is nothing in the record, other than the plaintiff's post-hearing assertions, to support his speculative contention that this "look" is evidence of prejudice against the plaintiff, who is African-American.

Based upon the foregoing, the plaintiff's claim that the ALJ was biased against him and failed to give him a fair hearing lacks merit.

### Treating Physicians

The plaintiff next argues that the ALJ erred by failing to properly consider the opinions of two of his treating physicians. The opinion of a treating physician is entitled to controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the case. *See* 20 C.F.R. §416.927(d)(2) (2006); *Mastro v. Apfel*, 270 F.3d 171, 178 (4th Cir. 2001). However, statements that a patient is "disabled" or "unable to work" or meets the Listing requirements or similar statements are not medical opinions. These are administrative findings reserved for the Commissioner's determination. SSR 96-2p. Furthermore, even if the plaintiff can produce conflicting evidence which might have

13

resulted in a contrary decision, the Commissioner's findings must be affirmed if substantial evidence supported the decision.  *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

The regulations provide that even if an ALJ determines that a treating physician's opinion is not entitled to controlling weight, he still must consider the weight given to the physician's opinion by applying five factors:  (1) the length of the treatment relationship and the frequency of the examinations; (2) the nature and extent of the treatment relationship; (3) the evidence with which the physician supports his opinion; (4) the consistency of the opinion; and (5) whether the physician is a specialist in the area in which he is rendering an opinion.  20 C.F.R. §404.1527(d)(2)-(5).  Social Security Ruling 96-2p requires that an ALJ give specific reasons for the weight given to a treating physician's medical opinion.  SSR 96-2p, 1996 WL 374188, *5.  As stated in Social Security Ruling 96-2p:

> A finding that a treating source medical opinion is not well supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to "controlling weight," not that the opinion should be rejected.  Treating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. 404.1527 and 416.927.  In many cases, a treating source's opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight.

*Id.* 1996 WL 374188, *4.

The plaintiff was diagnosed with diffuse disc bulge at the L3/4 and disc herniation at the L4/5 with spinal stenosis, evidenced by a CT scan of his lumbar spine of September 16, 2002 (Tr. 110).  He was also diagnosed with the same L4/5 herniation with additional L5/S1 disc protrusion with deformity of the thecal sac by MRI dated April 27, 2006 (Tr. 204).  The plaintiff was seen by Dr. Kansal, a neurosurgeon, who requested lumbar spine MRI and EMG and nerve conduction studies (Tr. 125) due to the severe leg pain and

14

extremity swelling not being explained by the lumbar x-rays or CT scan.  The plaintiff attended physical therapy requested by Dr. Lee from September 26, 2002, to November 26, 2002, without success (Tr. 126-132).

The plaintiff was diagnosed with severe pes planus by physical examination on May 5, 2003 (Tr. 140) and with back pain radiculitis after review of his x-rays, CT scan, and MRI (Tr. 141).  He was diagnosed with global polyneuropathy by nerve conduction studies on July 22, 2004 (Tr. 196).  He was also diagnosed with cervical DJD and osteopenia; forearm osteopenia by x-ray (Tr. 205).  The osteopenia was further evaluated by DEXA scan which showed osteopenia in the vertebral T score (-0.9) but not in the femoral T score (0.4) (Tr. 205).

The plaintiff began treatment with Dr. Wang from March 26, 2003, to May 26, 2004.  Dr. Wang noted numerous times the back pain, muscle spasms, knee pain, headaches, anxiety, malaise and fatigue, pain in right elbow, swelling of right hand, numbness of right shoulder, cramping in legs, and sinus problems.  Numerous prescriptions were written, anesthesia injections were given to reduce pain, and referrals to orthopedists were given.

On May 9, 2003, Dr. Wang wrote a report in which he asserted that the plaintiff's limitations included no prolonged sitting or standing and no lifting more than 15 pounds.  He noted that physical findings included tenderness at the L4-5 and laboratory findings included an MRI of the L4-5 disc space revealing broad based herniation (Tr. 143-44).

On November 10, 2003, Dr. Wang wrote a letter to the plaintiff's representatives in which he noted that the plaintiff had complained of neck pain since April 2002, joint pain in his elbows, knees and both wrists, and of a burning sensation in his left thigh.  Dr. Wang noted that an Independent Medical Evaluation ("IME") on October 28, 2003, revealed tenderness in the neck, spine, left elbow and both knees.  He commented

15

that the plaintiff had "a lot of pain in his lower back and both knees which limited his ability to function. He opined that the plaintiff had "work-related musculoskeletal disorders (WRMD)." He thought the plaintiff would be unable to walk or stand long enough to engage in a meaningful job; could not perform work requiring frequent standing, bending, lifting, and walking; and should not have lifted more than 15 pounds (Tr. 163-69).

Dr. Wang also completed a check-box assessment of the plaintiff's residual functional capacity, in which he indicated the plaintiff could lift and carry 10 pounds frequently and 20 pounds occasionally; needed a hand-held device to stand or walk; needed a sit stand option; was limited in his ability to push and pull; could never climb, crouch or crawl; could occasionally balance, stoop and kneel; had no manipulative, visual or communicative limitations; and needed to avoid concentrated exposure to extreme cold and heat, wetness, noise, humidity, vibration, fumes and hazards (Tr. 170-73).

The plaintiff then switched family doctors and began seeing Dr. Okereke. Dr. Okereke noted the same medical complaints and problems as Dr. Wang and was able to get some additional medical testing done. Dr. Okereke obtained a nerve conduction study ("NCS") that showed global polyneuropathy. The plaintiff contends that this accounts for the pain, numbness, and swelling of his extremities. Dr. Okereke was able to get cervical x-rays that showed degenerative joint disease ("DJD") in the plaintiff's neck. The plaintiff contends that this accounts for many of the headaches, the neck pain, pain radiating into his shoulder, elbow, and hands. A bone scan showed osteopenia of the neck, forearm, and lumbar spine.

Dr. Okereke completed a Medical Source Statement ("MSS") on May 13, 2005, three weeks after the ALJ issued her decision. This document was submitted to the Appeals Council, but was not available to the ALJ prior to the date of her decision. Dr. Okereke's MSS (Tr. 234-241) virtually mirrored the RFC of Dr. Wang with the exception that he stated the plaintiff could not lift at all. Both Dr. Okereke and Dr. Wang stated the plaintiff

16

needs a hand-held assistive device for ambulation.  Dr. Okereke stated that even with the cane, the plaintiff was limited to standing less than two hours in an eight-hour workday. Both Dr. Okereke and Dr. Wang found the plaintiff must alternate between sitting and standing to help relieve pain.  Dr. Okereke limited the plaintiff to sitting less than six hours in an eight-hour workday.  Both Dr. Okereke and Dr. Wang limited the plaintiff in his ability to perform push/pull activities with his upper extremities, but Dr. Okereke also limited his ability to perform push/pull activities with his lower extremities.  Dr. Okereke limited the plaintiff to occasional gross and fine manipulation and occasional reaching and handling. He also limited the plaintiff in all environmental arenas.  Dr. Okereke cited chronic back pain, back stiffness, antalgic gait, polyarthritis, and rheumatoid arthritis as his reasoning. Dr. Wang's IME and RFC limited the plaintiff to sedentary work with additional limitations, and Dr. Okereke's MSS limited the plaintiff to significantly reduced sedentary work activity.

The ALJ gave "little weight" to Dr. Wang's opinions because they were not supported by his own medical records and not consistent with the overall evidence of record (Tr. 17).  The ALJ noted that the medical records of Dr. Wang "consistently reveal no muscle or joint pain on musculoskeletal examinations, no intolerance of heat or cold, no depression or anxiety, and no hematuria" (Tr. 17).  It appears that Dr. Wang's medical records for every visit  say "no muscle pain or joint pain" under "musculoskeletal."  However, the chief complaint ("CC") section of the medical records changed on each visit.  For example, on April 9, 2003, the plaintiff's chief complaint was back pain.  However, under the musculoskeletal section, it reads "no muscle pain or joint pain" (Tr. 145).  Similarly, on that same visit, under the psychiatric section, the records read "no depression or anxiety." However, Dr. Wang diagnosed the plaintiff with anxiety himself on that very page (Tr. 145). As argued by the plaintiff, Dr. Wang and his staff clearly failed to change the sections that appear to be boilerplate language, but each time the plaintiff saw Dr. Wang, that particular

17

problem was noted in the CC.  On each visit, new diagnoses are added, new prescriptions are written, and other prescriptions are discontinued.

Dr. Wang's IME and RFC accurately reflect his medical notes.  Both the IME and RFC limit the plaintiff to the same exertional level.  Further, both reports are substantiated by Dr. Wang's findings of lumbago, muscle spasms, malaise, and fatigue, as well as his knowledge that the plaintiff has severe pes planus which causes foot, ankle, and knee pain.  Dr. Wang referenced the finding of severe pes planus of Dr. Kansal in his IME. Dr. Wang also referenced the CT scan showing the L4/5 disc herniation, the x-ray of Lockport Hospital showing arthritis in the left knee, and the finding of femoral nerve radiculopathy by Lockport Hospital (Tr. 164, 165).  Dr. Wang's examination of the plaintiff on October 28, 2003, also showed "pain in the neck since 4/29/02," later diagnosed as cervical DJD and "joint pain in right elbow and both knees and swelling in both wrists," later diagnosed as global polyneuropathy.

The records of Dr. Wang and Dr. Okereke document the plaintiff's medical problems, reference acceptable medical techniques, diagnostic techniques, and laboratory findings.  Both doctors reference findings of prior physicians such as Dr. Lee and Dr. Kansal.  The medical records of Dr. Wang and Dr. Okereke are consistent with each other and with the other treating sources.  Given that the ALJ did not have Dr. Okereke's opinion at the time of her decision, this court finds that the evidence may have changed the ALJ's opinion.  Accordingly, upon remand, the ALJ is directed to evaluate the opinions of Drs. Wang and Okereke in accordance with the above-cited law.

### *Residual Functional Capacity*

The plaintiff next argues that the ALJ erred by finding that he had the RFC to perform light work without any additional limitations.

18

> The Residual Functional Capacity ("RFC") assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations). In assessing RFC, the adjudicator must discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis (i.e., 8 hours a day, for 5 days a week, or an equivalent work schedule), and describe the maximum amount of each work- related activity the individual can perform based on the evidence available in the case record. The adjudicator must also explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved. . . .

SSR 96-8p, 1996 WL 374184, *7.

In a disability case, the combined effect of all the claimant's impairments must be considered without regard to whether any such impairment if considered separately would be sufficiently disabling. Where there is a combination of impairments, the issue "is not only the existence of the problems, but also the degree of their severity, and whether, together, they impaired the claimant's 'ability to engage in substantial gainful activity.'" *Oppenheim v. Finch*, 495 F.2d 396, 398 (4th Cir. 1974). The ailments should not be fractionalized and considered in isolation, but considered in combination to determine the impact on the ability of the claimant to engage in substantial gainful activity. *Id.* The cumulative or synergistic effect of the various impairments on the claimant's ability to work must be analyzed. *DeLoatche v. Heckler*, 715 F.2d 148, 150 (4th Cir. 1983).

The ALJ found the plaintiff has the RFC to perform light work activity without additional limitations (Tr. 21). As was discussed above, the ALJ failed to properly evaluate the opinion of Dr. Wang, and this court has recommended that the ALJ be instructed to re-evaluate Dr. Wang's opinion and to also consider the opinion of Dr. Okereke upon remand. Dr. Wang concluded that the plaintiff "can't walk or stand long enough to engage into meaningful physical job ... unsuitable to engage in jobs requiring standing, bending, lifting, and walking...should not lift more than 15 lbs" (Tr. 168-69). Dr. Wang also completed a

19

check-box assessment of the plaintiff's residual functional capacity, in which he indicated the plaintiff could lift and carry 10 pounds frequently and 20 pounds occasionally; needed a hand-held device to stand or walk; needed a sit stand option; was limited in his ability to push and pull; could never climb, crouch or crawl; could occasionally balance, stoop and kneel; had no manipulative, visual or communicative limitations; and needed to avoid concentrated exposure to extreme cold and heat, wetness, noise, humidity, vibration, fumes and hazards (Tr. 170-73).

Dr. Okereke stated that even with the cane, the plaintiff was limited to standing less than two hours in an eight-hour workday, and he limited the plaintiff to sitting less than six hours in an eight-hour workday. Dr. Okereke limited the plaintiff in his ability to perform push/pull activities with his upper and lower extremities. He also limited the plaintiff to occasional gross and fine manipulation and occasional reaching and handling, and he limited the plaintiff in all environmental arenas. Dr. Okereke cited chronic back pain, back stiffness, antalgic gait, polyarthritis, and rheumatoid arthritis as his reasoning. Dr. Wang's IME and RFC limited the plaintiff to sedentary work with additional limitations, and Dr. Okereke's MSS limited the plaintiff to significantly reduced sedentary work activity (Tr. 234-41).

The ALJ found the plaintiff could return to his past job as a car wash attendant. That job is found at DOT 915.667-010, is a light, unskilled job with an svp 2. According to the SCODOT, this job requires frequent reaching and handling, occasional exposure to wetness, and has a noise rating of 4 out of 5 (pl. brief 30). This job is directly contradicted by Dr. Okereke, who limited the plaintiff to occasional reaching, occasional handling, limited exposure to wetness, and limited exposure to noise.

The ALJ's finding that the plaintiff has the RFC to perform light work without additional limitations is not supported by substantial evidence. Accordingly, upon remand, the ALJ should be instructed to re-evaluate and explain the RFC assessment in accordance

with the above-cited law.  Further, in making the RFC assessment, the ALJ should be instructed to consider all of the plaintiff's impairments, even those that are not severe, in combination.  Further, the ALJ's finding that the plaintiff can perform his past relevant work is also not supported by substantial evidence.  Upon remand, the ALJ should be instructed to consider at the fifth step whether the plaintiff can perform alternative work and whether such work exists in significant numbers in the national economy.

## <u>CONCLUSION AND RECOMMENDATION</u>

Based upon the foregoing, this court recommends that the Commissioner's decision be reversed under sentence four of 42 U.S.C. §405(g), with a remand of the cause to the Commissioner for further proceedings as discussed above.

s/William M. Catoe
United States Magistrate Judge

April 11, 2008

Greenville, South Carolina

21